222-09/MEU
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
MALCON NAVIGATION CO LTD.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Michael E. Unger



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

MALCON NAVIGATION CO LTD.,

                   Plaintiff,

             -against-

**09 cv 2274  (LAP)**

**<u>SECOND AMENDED<br>VERIFIED COMPLAINT</u>**

BRAVE BULK TRANSPORT LTD., a/k/a BBT LTD.,
a/k/a BRAVE BULK TRANSPORT LTD., LIBERIA,
a/k/a BBT LIBERIA a/k/a, BRAVE BULK TRANSPORT
LTD., MONROVIA, a/k/a BBT MONROVIA., a/k/a
BRAVE BULK TRANSPORT LTD., MALTA, a/k/a
BBT MALTA,

                   Defendant.

----------------------------------------------------------x

       Plaintiff, MALCON NAVIGATION CO LTD. ("MALCON"), by its attorneys

Freehill, Hogan and Mahar, LLP., as and for its Amended Verified Complaint against

Defendant BRAVE BULK TRANSPORT LTD. a/k/a BBT LTD., a/k/a BRAVE BULK

TRANSPORT LTD., LIBERIA, a/k/a BBT LIBERIA a/k/a, BRAVE BULK

TRANSPORT LTD., MONROVIA, a/k/a BBT MONROVIA a/k/a, BRAVE BULK

TRANSPORT LTD., MALTA, a/k/a BBT MALTA, ("BRAVE BULK") and alleges as

follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract.  This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.  Federal jurisdiction also exists because the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times material hereto, Plaintiff MALCON was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address c/o Hellenic Star Shipping Co SA, 7 Sina Street, Maroussi, 15 124 Athens, Greece.

3.    At all times relevant hereto, Defendant BRAVE BULK was and still is a foreign business entity duly organized and existing under the laws of a foreign country with addresses at 302 Winsome House, 73 Wyndham Street, Hong Kong , c/o Apollon Building No2, 331 Kifisias Avenue, 14561 Kifissia Athens Greece, and  80 Broad Street Monrovia, Liberia.

4.    On or about June 9, 2006, Plaintiff MALCON, in its capacity as owner of the M/V SEA PRIDE, entered into a maritime contract of charter party on an amended New York Produce Exchange form with Defendant, as charterer of the vessel for one time chartered trip from Hamburg, Germany to Umm Qasr, Iraq. See charter party attached hereto as Exhibit A.

5.    Under the terms of the charter, Defendant was to pay hire in the sum of $19,000.00 per day pro rata every 15 days in advance.

6.      Plaintiff MALCON duly delivered the M/V SEA PRIDE into the service of Defendant on or about June 17, 2006 at Hamburg, Germany where the vessel loaded a cargo of wheat.

7.      The charter was expected to take approximately 60 days.

8.      The M/V SEA PRIDE arrived at Umm Qasr on or about July 19, 2006 and tendered its notice of arrival. The cargo of wheat was partially discharged on or about November 19, 2006, four months after arrival at Umm Qasr, the remaining cargo was subsequently discharged in Kuwait on or about December 26, 2006.

9.      Plaintiff MALCON has duly performed its obligations under the charter.

10.      In breach of the charter Defendant failed to promptly discharge the cargo upon arrival in Umm Qasr as required pursuant to clause 8 of the charter.  See clause 8 of charter party attached hereto as Exhibit A.

11.      Under the terms of the charter, the cargo was to be promptly discharged and the M/V SEA PRIDE should have subsequently been redelivered to Plaintiff MALCON on or about August 17, 2006.

12.      In breach of the charter, Defendant failed to redeliver the vessel on or about August 17, 2006, and instead delayed redelivery until January 18, 2007, 154 days after the expected time for redelivery.

13.      In further breach, Defendant failed to promptly discharge the vessel causing the M/V SEA PRIDE to remain in Umm Qasr for an extended period of time resulting in significant accumulation of marine growth on the hull, affecting the vessel's performance and necessitating hull cleaning in the amount of $4,300.00.

14. Defendant has admitted that it breached the charter party in failing to redeliver the vessel timely, but contests the quantum of Plaintiff MALCON's loss and its liability for hull-cleaning expenses.

15. Defendant's breach caused a loss in earnings by the M/V SEA PRIDE for 154 days which amounts to $852,500.00 plus interest from the time of breach. This amount is based upon the difference between market rate and the charter rate which is the proper measure of damages under English Law. See clause 84 of charter party attached hereto as Exhibit A.

16. In total, Defendant has failed to pay $856,800.00 ($852,500.00 in damages for failure to timely redeliver + $4,300.00 in hull cleaning charges).

17. Plaintiff MALCON has duly demanded payment of the above sums from Defendant which has failed and otherwise refused to pay the sums due to Plaintiff in breach of the charter.

18. Under the terms of the Charter between Plaintiff MALCON and Defendant, payment was to be made in U.S. Dollars. Plaintiff MALCON further believes that Defendant has chartered other vessels and engaged in other business such that it will be receiving, or making, regular payments in U.S. dollars under those other charter parties or other business transactions.

19. The charter party provides for all disputes between the parties to be resolved by arbitration in London with the English Law to apply.

20. Plaintiff has commenced arbitration proceedings against BRAVE BULK in London, seeking recovery of the sums set forth above, together with all further losses incurred.

21.     This action is brought to obtain jurisdiction over Defendant, to obtain security in favor of Plaintiff in respect of its claims, and in aid of the London proceedings.

22.     This action is further brought to obtain security for additional sums to cover Plaintiff's anticipated attorney fees and costs in the London arbitration and interest, all of which are recoverable as part of Plaintiff's main claim under English Law.

23.     Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as an element of Plaintiffs' claim.

24.     Plaintiff MALCON estimates, as nearly as can presently be computed, that the legal fees and costs of prosecuting its claims in London arbitration will be $100,000.00.     Interest anticipated to be awarded is estimated to be $89,523.69 (calculated at the rate of 5% per annum compounded quarterly for a period of two years, the estimated time for completion of the proceedings in London).

25.     In summary, the items of damages for which Plaintiff brings this action seeking security are as follows:

        1)  Unpaid principal in the amount of $856,800.00;

        2)  Interest on the above sum in the amount of $89,523.69;

        3)  Arbitration costs and legal fees in the amount of $100,000.00.

26.     The name "Brave Bulk Transport Ltd." refers to a single entity. In the course of its business "Brave Bulk Transport Ltd." uses a variety of different names including "Brave Bulk Transport Ltd." with the addition of the geographic location of its offices. For example, the names "BRAVE BULK TRANSPORT LTD.", "BRAVE

BULK TRANSPORT LTD., LIBERIA", and "BRAVE BULK TRANSPORT LTD.,

MONROVIA," and "BRAVE BULK TRANSPORT LTD., MALTA" actually reference

"Brave Bulk Transport Ltd." by its local and regional offices in Monrovia, Liberia and

the Malta entity with offices in Greece. Additionally, "Brave Bulk Transport Ltd." also

uses the shortened name "BBT" with the addition of the geographic location of its offices

such that "BBT LIBERIA" and "BBT MONROVIA", and "BBT MALTA" are

frequently used to denote "Brave Bulk Transport Ltd.'s" individual offices. Accordingly,

despite the small variation in name which results from appending the geographic location

of Defendants' offices to its name, these different names reference but one entity.

27.     Defendant BRAVE BULK TRANSPORT LTD has used its aliases BBT

(Brave Bulk Transport) Ltd. Monrovia and BBT (Brave Bulk Transport) Ltd., Malta in a

forward freight agreement dated September 9, 2008, a copy of which is attached hereto as

Exhibit B. Under the terms of that contract payment was to be made to Defendant in the

name "Brave Bulk Transport Ltd." Ex. B at 17. The contract lists George Leventis as the

"P.I.C." for Defendants. See Ex. B. See also *Transfield ER Futures Ltd v. Brave Bulk
Transport Ltd., Monrovia*, 09 cv 2086.

28.     Defendant has appeared in the District in *Brave Bulk Transport Ltd., v.
Five Ocean Corporation*, 08 cv 1077 (S.D.N.Y. 2008). That action involved a fixture

entered into by Defendant under the name "BRAVE BULK TRANSPORT LTD. OF

LIBERIA." A copy of that fixture is attached hereto as Exhibit C. When Defendant

commenced an action, however, the action was brought under the name "Brave Bulk

Transport Ltd." Defendant entered into the fixture thought its agent George Leventis as.

"Director Chartering Department." See Ex. C.

29. In the instant matter, Defendant entered into the charter as "Brave Bulk Transport Ltd,. charterers of Malta." See Ex. A.

30. In the alternative, to the extent that Defendant has created separate corporations under the laws of Liberia, Greece, Malta or any other nation, the separate corporate entities are mere departments within Defendant Brave Bulk Transport Ltd. and are operated as such.

31. In the further alternative, Defendant, to the extent it has created separate corporations, it controls all such corporations and has unity of ownership and control in them such that there is no separate ownership or identity of the individual corporations which together operate as the Defendant. Defendant operates though common employees such as George Leventis, and conducts its actual operations from its place of business in Greece.

32. In the further alternative, to the extent that Defendant has created separate corporations, it is the parent and sole shareholder of such corporations and dominates and controls such corporations such that they are mere departments or alter egos of the Defendant and have no independent identity.

33. In the further alternative, Defendant is in fact a group of highly related companies engaged in common business ventures and share common ownership, officers and/or directors with other Defendants.

34. In the alternative, to the extent Defendant has created separate corporations, such corporations are entities within a group of companies and are used as paying or receiving agents or pass through entities in an attempt to insulate the entities from creditors relating to commercial obligations.

35. It is not the general practice in the maritime community, nor any other business, for independent companies to make or receive large payments on behalf of other "independent" companies.

36. Defendant has entered into contracts under its aliases but named "BRAVE BULK TRANSPORT LTD" as the party to be paid.

37. Payments sent or received on behalf of another "independent" company are suggestive of a relationship that is not arms length.

38. Based on the foregoing, as well as other activities, Defendant BRAVE BULK should be considered as a single economic unit. To the extent that it is composed of separate corporations, such corporate form does not give rise to independent entities or any distinction between or among the corporations. Thus, to the extent Defendant is composed of separate corporations, those corporations should be regarded as one entity, rendering each liable for the debts of the other, and all holding or transferring assets of Defendant susceptible to attachment and/or restraint for the debts of Defendant.

39. Based on the foregoing, as well as other activities, all assets of Defendant BRAVE BULK, regardless of the name or names used in the transaction, are susceptible to attachment and/or restraint for the debts of Defendant.

40. By virtue of the foregoing, Defendant BRAVE BULK, and any other names under which it operates, even if a separate corporation, is properly considered one entity which has entered into the subject charter party under trade names, aliases, alter egos, paying agents, corporate agents, officers, directors, controlling shareholders, owners, partners, and/or prime movers and controllers of Defendant.

41. In all, the claim for which Plaintiff MALCON sues in this action, as near as presently may be estimated, totals **$1,046,323.69**, no part of which has been paid by Defendant, despite due demand. Plaintiff MALCON specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure MALCON.

### Request for Rule B Relief

42. Upon information and belief, and after investigation, the Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire or any other assets of, belonging to, due or being transferred for the benefit of the said Defendant under any of its aliases, including BRAVE BULK TRANSPORT LTD., BBT LTD., BRAVE BULK TRANSPORT LTD., LIBERIA, BBT LIBERIA, BRAVE BULK TRANSPORT, LTD., MONROVIA, BBT MONROVIA., BRAVE BULK TRANSPORT LTD., MALTA, and BBT MALTA, (collectively hereinafter, "ASSETS"), including but not limited to ASSETS as may be held, received or transferred in their name or for its benefit, at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

43. The total amount to be attached pursuant to the calculations set forth above is **$1,046,323.69.**

WHEREFORE, Plaintiff prays:

a.     That process in due form of law according to the practice of this Court may issue against Defendant citing them to appear and answer the foregoing;

b.     That if Defendant cannot be found within this District pursuant to Supplemental Rule B all tangible or intangible property of Defendant up to and including the sum of **$1,046,323.69** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due, held or being transferred to or for the benefit of Defendant, at, moving through or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.     That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to an order compelling the Defendant to arbitrate and/or the recognition and enforcement of any award or judgment entered against the Defendants in the London arbitration proceedings; and

d.     For such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
July 13, 2009

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
MALCON NAVIGATION CO LTD.

By: _____

Michael E. Unger
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

# EXHIBIT A

COPY

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946




1 **This Charter Party,** made and concluded in ..... *Athens, on the 9th* ..................... day of ...*June*............... 19..*2006*.....
2 Between ..*MALCON NAVIGATION CO LTD VALETTA, MALTA* ...................................................................
3 Owners of the good ........... Steamship/Motorship .... *SEA PRIDE (See Description Clause 45)* ................................. of ..........
4 of *38211* .............. tons gross register, and .....*22371* ........ tons net register, having engines of ........................ indicated horse power
5 and with hull, machinery and equipment in a thoroughly efficient state, and classed *KOREAN REGISTRY (K.R.S.)* ........................
6 at......................... of about.................... cubic feet bale capacity, and about ...........................................................
7 ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,~~
8 ~~allowing a minimum of fifty tons) on a draft of~~ .............. feet ............... inches on ............ Summer freeboard, inclusive of permanent bunkers,
9 ~~which are of the capacity of about~~ ................................... tons of fuel, and capable of steaming, fully laden, under good weather
10 ~~conditions about~~ .............. knots on a consumption of about ....................... tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,
11 now ...*trading*......................................................................................................................
12 .................................... and ...*Brave Bulk Transport Ltd.* ................... Charterers of the City of ..*Malta*...........

13 **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14 about ...*a time charter trip via safe ports, safe berths, safe anchorages, always afloat except NAABSA if Umm Qasr only and* ...
15 *always within Institute Warranty Limits via Continent to Persian Gulf, intention Iraq with grains/grain products approved by*
16 *UN*...........................................................................................within below mentioned trading limits.
17 Charterers to have liberty to sublet the vessel for all or any part of the time covered ~~by this Charter,~~ but Charterers remaining responsible for
18 the fulfilment of this Charter Party.
19 Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot Rotterdam any time day or night Sundays and*
20 *Holidays included*...................................................................................................................
21 ...................................................................................................................
22 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~
23 ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery to be
24 ready to receive cargo with clean-swept holds *washed down by fresh water and dried up* and tight, staunch, strong and in every way fitted for the
25 *ordinary cargo* service, having water-ballast, winches and
26 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
27 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
28 dise, including petroleum or its products ~~in proper container~~ excluding ...................................................................
29 ~~(vessel is not to be employed in the carriage of Live-Stock but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
30 ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
31 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
32 ~~Mexico, and/or South America~~ *intention bulk wheat. See Clause 47*..........................................and/or Europe
33 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence, between~~
34 ~~October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding: when out of season, White Sea, Black Sea and the Baltic~~
35 *See Clause 52*......................................................................................................................
36 ...................................................................................................................
37 as the Charterers or their Agents shall direct, on the following conditions:

38 1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
39 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
40 the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service *with inspection certificates necessary to comply*
41 *with requirements at ports of call.*

42 2. That *whilst on hire* the Charterers shall provide and pay for all the fuel *and MDO* except as otherwise agreed, Port Charges, *Canal dues,*
43 *Boatage on Charterers' business,* Pilotages, Agencies, Commissions,
44 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
45 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
46 illness of the crew to be for Owners account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
47 of six months or more.
48 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
49 ~~Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards~~
50 ~~for dunnage, they making good any damage thereto.~~

51 3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
52 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ ..................................................
53 ...................................... tons and to be re-delivered with not less than ..................................... tons and not more than ..............

54 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 19,000 daily including overtime, payable*
55 *every 15 days in advance directly to Owners' bank account, First hire to be paid within 2 banking days after delivery in United*

COPY

... ¢ per day and ten on vessels total-deadweight-carrying capacity, including bunkers and
stores, in pro rata, ......................................... per freeboard, per Calendar Month, commencing on and from the day/time of her delivery, as aforesaid, and at

54 and after the same rate for any part of a month day, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55 wear and tear excepted, to the Owners (unless lost) at on passing Muscat Outbound any time day or night Sundays and Holidays included
56 ........ unless otherwise mutually agreed. Charterers are to give Owners not less than 20/15/10/7/5 days approximate and 7/5/3/2/1 days definite
57 notice of vessels expected date of re-delivery, and probable port, Charterers to keep Owners advised of vessel's movements and notify Owners
immediately of unforeseen circumstances.

58 5. Payment of said hire to be made in as per Clause 46 New York in each in United States Currency, semi-monthly every 15 days in advance, and
for the telegrafically into Owners' account in and for the last 15 days last half month or
59 part-of-same-the-approximate-amount-of-hire, and-should-same-not-cover-the-actual-time, hire-is-to-be-paid-for-the-balance-day-by-day; so-it-becomes
60 due, if-so-required-by-Owners, unless-bank-guarantee-or-deposit-is-made-by-the-Charterers, otherwise failing the punctual and regular payment of the
61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers —Time-to-count-from-7-a.m.-on-the-working-day
63 following-that-on-which-written-notice-of-readiness-has-been-given-to-Charterers-or-their-Agents-before-4-p.m., but-if-required-by-Charterers, they
64 to-have-the-privilege-of-using-vessel-at-once, such-time-used-to-count-as-hire;

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Headowners/Captain, by the Charterers or their Agents, subject
66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67 of such advances.

68 6. That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf or safe place that Charterers or their Agents may
69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places Iraq where it is customary for similar size vessels to safely
70 lie aground.

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel.—Charterers have the privilege of passengers as far as accommodations allow, Charterers
74 paying-Owners................................................per-day-per-passenger-for-accommodation-and-meals; However, it is agreed that in case any fines or extra expenses are
75 incurred in-the-consequences-of-the-carriage-of-passengers, Charterers-are-to-bear-such-risk-and-expense.

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78 agency, and Charterers are to load, stow, and trim, check, dunnage/undunnage, lash, tally, unlash, secure and discharge the cargo at their
79 expense under the supervision of the Captain, who is to sign Bills of Lading if required to do so by Charterers for
cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84 rate of $10.00 per day. Owners-to-victual-Pilots-and-Customs-Officers, and-also, when-authorized-by-Charterers-or-their-Agents, to-victual-Tally
85 Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. See Clause 36

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88 terers, their Agents or Supercargo, when required, with a true abstract copy of daily Logs, showing the course of the vessel and distance run and the con-
89 sumption of fuel.

90 12. That the Captain shall use diligence in caring for the ventilation of the cargo, Vessel has only natural ventilation.
91 13. That the Charterers shall have the option of continuing this charter for a further period of..............................................
92 ...........................................................
93 on giving written notice thereof to the Owners or their Agents...........................................days previous to the expiration of the first named term, or any declared option

94 14. That if required by Charterers, time not to commence before 00:01hrs, 15th June 2006.................................., and should vessel
95 not have delivered given written notice of readiness on or before 23:59hrs, 19th June 2006................ but not later than 24:00 hours 4 pm, Charterers or
96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97 15. That in the event of the loss of time from deficiency and/or default of Owners, crew of men or stores, fire, breakdown or damages to hull,
machinery or equipment unless caused by Charterers and/or their agents and/or their servants
98 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra directly related expenses full documented from relevant agents shall be deducted from the hire .

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.

107 17. That-should-any-dispute-arise-between-Owners-and-the-Charterers, the-matter-in-dispute-shall-be-referred-to-three-persons-at-New-York:
108 one-to-be-appointed-by-each-of-the-parties-hereto, and-the-third-by-the-two-so-chosen; their-decision-or-that-of-any-two-of-them, shall-be-final, and-for
109 the-purpose-of-enforcing-any-award, this-agreement-may-be-made-a-rule-of-the-Court. The-Arbitrators-shall-be-commercial-men. See Clause 84

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights and sub-hires for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115
116 ~~article,~~ General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and York-Antwerp Rules 1974 ~~1934~~ and any amendments thereto as amended 1990 and 1994 in London ~~at such port or place in the United~~
117 ~~States as may be selected by the carrier, and as to matters not provided for by these~~
118 Rules, according to the laws and usages at the port of London ~~New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
119 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
120 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
121 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
122 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
123 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
124 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
125 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
126 ~~United States money.~~
127 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
128 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
129 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
130 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
131 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
ships belonged to strangers. Hire not to contribute to General Average.
132 Provisions as to General Average in accordance with the above and the New Jason Clause are to be included in all bills of lading issued hereunder.
133 20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.
135 ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting and payment of the hire to be suspended until she is again in proper state for the service.~~
138
139
140 ~~22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~
143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~
144 ~~Charterers to have the use of any gear on board the vessel.~~
145 23. Vessel to work night and day, if required by Charterers, vessel is gearless ~~and all winches to be at Charterers' disposal during loading and~~
146 ~~discharging~~
147 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
148 ~~deck hands and deckaymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
149 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers, as the owner of a disabled winch or winches, or~~
150 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof. If required, and pay any loss of time occasioned~~
thereby.
151 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~
155
156 U.S.A. Clause Paramount General Clause Paramount
157 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
158 ~~16, 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of~~
159 ~~any of its rights or immunities or an increase of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
160 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
161 Both-to-Blame Collision Clause
162 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
163 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
164 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
165 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
166 ~~carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her~~
167 ~~owners as part of their claim against the carrying ship or carrier.~~
25. The vessel shall not be required to force Ice or enter any ice-breaker or to enter any ice-bound port, or any port where lights or light-ships have
168 been or are about to be withdrawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging.
170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, acts of pilot and tugboats except actions or strikes which not against the Owners insurance, crew, and all other
similar matters, same as when trading for their own account,
172 27. A commission of 1.25 2 1/2 per cent is payable by the Vessel and Owners to Ace Chartering S.A.
173
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28. An address commission of 3.75 2 1/2 per cent payable to ............Charterers.................... on the hire earned and paid under this Charter.

Additional Clauses 29-101 inclusive thereto are to be fully incorporated in this Charter Party.

For and on behalf of Owners

For and on behalf of Charterers

# COPY



This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.


**Clause 29**

The General Paramount Clause, incorporating the Hague and Hague-Visby Rules, New Jason Clause, BIMCO Conwartime 2004, P and I Club Nuclear Clause, New Both-to-Blame Collision Clause, P and I Bunker Deviation Clause, as attached, which both parties declare to know in full, to be incorporated in this Charter Party and Bill of Lading issued to this Charter Party.

**Clause 30**

Owners to maintain the vessel classed equivalent to Indian Register of Shipping for the period of this Charter.

**Clause 31**

Deratisation certificates to be supplied by Owners on delivery and to cover the whole period of time charter, otherwise cost and anytime in obtaining same to be for Owners' account.

**Clause 32**

Vessel to supply, if and when required by Charterers or their Agents at all ports, free of expenses to Charterers, sufficient lights as on board at the same time in all holds and on deck to allow full night work.

**Clause 33**

All opening and closing of hatches of each calling port to be done by ship's crew, prior loading and or discharge so that loading and/or discharge can commence as soon as possible after vessel's arrival at each port of loading/discharge, if weather and time permitted.

Above always provided local port/labour regulations allow the crew to perform these tasks, otherwise shore labour to be employed by Charterers at their expense.

**Clause 34**

Deleted.

**Clause 35**

Any damage caused by stevedores during the currency of this Charter Party shall be reported by the master to the Charterers or their agents, in writting, within 24 hours of the occurance or as soon as possible thereafter but latest when the damage could have been discovered by the exercise of due diligence. The master shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in the meantime.

Stevedore damage affecting seaworthiness or proper working of the vessel and/or her equipment, shall be repaired without delay to the vessel after each occurance in the Charterers' time and shall be paid for by the Charterers. Other repairs shall be done at the same time, but if this is not possible, same shall be repaired whilst vessel is in drydock in Owners' time, provided this does not interfere with Owners' repair work, or by vessel's crew at the Owners' convenience.



All costs of such repairs shall be for Charterers' account. Any time spent in repairing stevedore damage shall be for Charterers account. The Charterers shall pay for the stevedore damage whether or not payment has been made by stevedores to Charterers.

### Clause 36

Owners to deliver vessel with clean, swept, washed down by fresh water and dried up holds and Charterers to redeliver the vessel with clean swept holds same as on delivery.

Charterers have the option to pay lumpsum USD5,000 in lieu of holds cleaning on redelivery, excluding disposal/removal of dunnage, lashing materials and debris which Charterers confirm will remove from the ship prior redelivery.

Charterers to pay Owners lumpsum USD1,250 per mouth or pro rata for part thereof cable, victualling and entertainment etc.

### Clause 37

All bunkers used by the vessel whilst off-hire and to be for Owners' account.

### Clause 38

Watchmen for cargo to be for Charterers' account, watchmen ordered by the vessel for vessel's purposes to be for Owners' account. Compulsory watchmen to be for Charterers' account.

### Clause 39

Deleted.

### Clause 40

Master to furnish Charterers between loading and discharging ports with two copies of the log book abstract, both deck and engine having to show vessel's daily average speed, course, force to wind, revolutions of engine and consumption of both fuel and diesel oil. Because Owners log book is written in English. Charterers are to supply Master with respective documents/forms to be filled in English.

### Clause 41    War Risk Insurance

Basic war risk insurance premium shall be for Owners' account. Additional war risk premium as levied by Owners' underwriter including blocking and trapping to be for Charterers account as per "Hellenic War Risk Mutual Association" invoice. Crew war bonus if any to be for Owners account. Vessel is insured with "Hellenic War Risk Mutual Association".

### Clause 42

Owners' P and I Club is West of England.
Hull and Machinery Value is United States Dollars (USD) 14,5 million.
Charterers have the benefit of Owners granted by the P and I Club so far as the club rules permit.



# M.V. "SEA PRIDE"
## CHARTER PARTY DATED 9th JUNE, 2006
### ADDITIONAL CLAUSES



**Clause 43**

In case of war between two or more of the following countries - USA, UK., Japan, France, Russia, Communist China, Greece, Germany, both parties have the option of cancelling Charter Party provided the vessel is free of cargo and always provided that such a situation affects the purpose of this Charter Party.

Also the Charter to be automatically terminated should the government of the vessel's flag requisition the vessel.

It is understood and agreed that war or actual hostilities means direct war or hostilities between the aforementioned countries and does not include local hostilities or civil war where any of these countries support opposing sides. Owners and Charterers will not take advantage of this clause in case of a limited conflict.

**Clause 44**

The Master to cable or telex Charterers on sailing from each port, giving sailing date and time, quantity loaded according to draft of the vessel as well as manifested weights and cubic meters also E.T.A., and amendments during the voyage, if necessary.

COPY

COPY



Clause 45    Vessel's Description

M/V 'SEA PRIDE'

CALL SIGN: 9HFL5
PMAX BC, GEARLESS, BLT '83, MALTA FLAG
GRAINCLEAN/AUSSIE FITTED
DWAT: 68.892 MT DRAFT: 13,788 M SSW
DWAT: 67.063 MT DRAFT: 13.51 M WSW
TPC: ABT 63.6MT
CLASS K.R.S. (KOREAN REGISTRY)
INT GRT/NRT :38,211/22,371
SUEZ GRT/NRT :39,476.53/34,999.68
PAN GRT/NRT :39,343/30,689
LOA/BEAM: ABT 227,80/32,30
GRAIN IN MAINHOLDS/BREAKDOWN:
    NO.1 HO  10457
    NO.2 HO  11858
    NO.3 HO  11915
    NO.4 HO  11655
    NO.5 HO  11617
    NO.6 HO  11849
    NO.7 HO  11379

    TOTAL  80730 - 2.850.899 CBFT
VSL NO CO2 FTTD AT HOLDS
HATCHES:7/7
HATCH DIMENSIONS: NO.1 10,80 X 14,38  NO.2-7 14,38 X 15,12 MTRS SIDE
ROLLING HATCHCOVERS
STRENGHTS: TTOP 29.50 MT P2M
WDECK 3.00 MT P2M
HCOV 1.75 MT P2M
ABT 13.5 KNOTS ON ABT 36 MTS LADEN + ABT 2.5 MT MDO AT SEA
ABT 13.5 KNOTS ON ABT 34 MTS BALLAST + ABT 2.5 MT MDO AT SEA
IDLE/PORT CONS ABT 2.5 MTS MDO
IFO 180 CST RME 25 /MDO DMB
VSL BURNS MDO WHEN MANOUVERING IN/OUT PORTS/CANALS/RIVERS/
STRAITS/ SHALLOW WATERS OR WHEN NAVIGATES IN RESTRICTED WATERS WITH
OR WITHOUT PILOT TO MASTER'S DISCRETION AS WELL AS WHEN BALLASTING/
DE- BALLASTING
CONSTANT EXCL FW : ABT 600 MT ALL DTLS ABT
ALL DTLS ABT

- Last 5 cargoes, chrts, load/disch ports

-AZURE    CP 07.04.06 GRAINS UPRIVER/ROTTERDAM
           CP 07.04.06 IRON ORE TUBARAO/CAMPANA
-WORTHINGTON  CP 17.02.06 BEANS SANTOS/ ROTTERDAM





-BUNGE GENEVA CP 03.01.06 GRAINS MISSRIVER/EGYPT
-WORTHINGTON CP 11.11.05 GRAINS ECSA/ROTTERDAM

- DWAT ON 10.50M SW : ABT 48250 MT
- DWAT ON 11.00M SW : ABT 51250 MT

- OWNS: MALCON NAVIGATION CO LTD VALETTA/MALTA
  MANAGERS: HELLENIC STAR SHIPPING, ATHENS/GREECE
- CF GR CAPACITY AS GIVEN IS DEEMED TO BE ALL IN MAIN/CLEAR/
  /UNOBSTRUCTED HOS ONLY.
- 'ISM' CLAUSE TO APPLY

## Clause 46

Hire and bunker value on delivery to be paid to Owners bank account as follows:

LAIKI BANK (HELLAS)S.A.
63, HEROON POLYTECHNIOU STR.- PIRAEUS
SWIFT CODE: EPPBGRAA
IBAN NO: GR98.0310.0040.0000.0402.7074.151
CORRESPONDENT BANK: DEUTSCHE BANK TRUST COMPANY AMERICAS
                    60 WALL STR,N.Y.10005 USA
SWIFT CODE: BKTRUS33, ABA#021 00 10 33
IN FAVOUR OF: HELLENIC STAR SHIPPING CO S.A.
ACC NO: 004.027074.151
RE.: M/V SEA PRIDE/BBT

First hire and value of bunkers on delivery to be paid within 2 banking days after vessel's delivery. Charterers are entitled to deduct from last sufficient hire payments estimated Owners disbursements but maximum USD1.500 under whole this Charter period as well as value of bunkers on redelivery, but no deduction at relevant port in case it is proven that Owners settle all Owners' disbursements directly with agents or no Owners disbursements.

## Clause 47     Cargo Exclusions

Cargo to be bulk grains only excluding sunflower seed expellers.
All cargoes always to be loaded, stowed and discharged in accordance with IMO/Solas recommendations of code of safe practice for solid bulk cargoes also always to conform with vessel's class certificate/requirements.

## Clause 48

Should the vessel put back while on voyage by Owners liable reason of an accident or breakdown, the hire shall be suspended from time of her putting back until she is again in the same or equivalent position and the voyage resumed there from.



**Clause 49**

Owners warrant to have secured and carry on board the vessel a US. Federal Maritime Commission Certificate of Financial responsibility as required under the U.S. Water Quality Enforcement Act of 1970. In no case shall Charterers be liable for delay as a result of Owners failure to obtain the above mentioned certificate.

Oil Pollution Clause

1.     Owners warrant that throughout the currency of this Charter they will provide the vessel with following certificates:

1.1    Certificates issued pursuant to Section 311 (P) of the US Federal Water Pollution Control Act, as mentioned (Title 33 US code, Section 1321 (P) up to (insert the date upon which such certificate(s) is/are due to expire).

1.2.   Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990 and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coal Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

2)     Notwithstanding anything whether printed or typed herein to the contrary:

a) Save as required for compliance with paragraph (1) thereof Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

b) Deleted
c) Deleted

3) Deleted

**Clause 50**

Charterers to have the privilege at their risk and expense of using bulldozers and/or forklifts with rubber wheels in vessel's holds, never to exceed maximum weight permissible on tank tops as per vessel's specifications.

**Clause 51**

Charterers have the liberty to fumigate the cargo on board at loading and discharging ports or places en route at their risk and expenses.
If due to fumigation officers/crew must be accommodated in hotel all expenses including victualling to be for Charterers' account.



# M.V. "SEA PRIDE"
## CHARTER PARTY DATED 9th JUNE, 2006
### ADDITIONAL CLAUSES

**Clause 52     Trading Exclusions**

North Korea, Cambodia, CIS Pacific ports, Israel, Lebanon, Libya, Turkich occupied Cyprus, Sea of Azov, Albania, Cuba, Haiti, Great lakes, Angola, Nigeria, Namibia, Liberia, Sweden, Norway, Finland, Denmark, Yemen, Ethiopia, Erythrea, Somalia, Iran, Georgia(including Abkhazia), Sierra Leone, Yugoslavia federal republic of Serbia and Montenegro, Bosnia-Herzegovina, Congo democratic republic of Zaire, Sri Lanka, all war/war-like zones and closed areas.

**Clause 53**

STOWAGE AND TRIMMING
Charterers are to leave the vessel in safe and seaworthy trim and with cargo on board safely stowed, dunnaged and secured to the master's satisfaction for all shiftings between berths and all passages between ports under this charter in their time and at their expenses.

**Clause 54**

During navigation, everyday, the Master to telegraph to Charterers the noon position revolutions of engine, speed with force and direction and ETA at first port.

**Clause 55**

Except for first hire, and delivery bunkers payment, it is also agreed, that if owing to formalities any hire is not credited to Owners' account on the due date, Owners are to give Charterers two (2) working days grace before having power to exercise their rights under terms of this Charter. However, Owners to give Charterers 48 hours warning that it is their intention to exercise such rights.

**Clause 56**

Owners guarantee that vessel is not blacklisted by trading countries due to vessel's ownership/operators/age.

Any loss of time caused as a result of a failure on the Owners part to honour the guarantee to be for their account.

Owners guarantee that vessel has not relation to ex-Yugoslavia in vessel's flag/ownership/crew/etc.

**Clause 57**

Owners to provide Charterers with copies of vessel's capacity plan, deadweight scale and general arrangement plan. The last three documents to be couriered to Charterers on the first working day in India after fixing fully or Master to give same to Charterers agents on arrival at the first loading port. Owners are to instruct Master to furnish those plans to Charterers' Agents for making copies.


**Clause 58**

Charterers undertake to keep Owners informed during Charter Party periods as regards itinerary of vessel and name of agents at port of call.

**Clause 59    Bunker Clause**

Bunkers on delivery estimated to be about 850/950 mt IFO and about 100/120 mt MDO.
Bunkers on redelivery about same quantities as actually on board on delivery.
Full value of bunkers to be paid together with first hire.
Prices both ends USD335 per metric ton IFO and USD580 per metric ton MDO.

**Clause 60**

Should the vessel be arrested during the currency of this Charter Party at the suit of any person have or purporting to have a claim against or any interest in the vessel or should the vessel be in any way detained in the instance of any third party, hire under the Charter Party shall not be payable in respect of time lost whilst the vessel remains unemployed as a result of any such arrest or detention and the Owners shall reimburse the Charterers any expenditure such as additional dock dues and stand-by labour charges which the Charterers may incur under this Charter Party in respect of any period which by virtue of the operations of this Clause no hire is payable, always providing not caused by Charterers' omission or fault. Charterers undertake to endeavour to mitigate damages.

Owners guarantee that the vessel is I.T.F. or equivalent, vessel is P.O.E.A. fitted and can trade within trading limits of this Charter Party without interference from the ITF similar labour organisations.

Should the vessel be arrested or detained at the instance of the ITF or any similar labour organisation then no hire shall be payable for the time lost and the Charterers shall be entitled to the benefit of all the provisions in Clause above.

In the event that the vessel is delayed by strikes, lockouts, labour stoppages or boycotts or any other difficulties due to flag, or ownership or crew or payment of crew of this vessel or other vessel under the same ownership/management such time lost and all costs, expenses, consequences which might occur out of this fact to be for Owners' account, including bunker/diesel fuel consumed during such period.

The vessel to have the liberty of using diesel oil when entering or sailing port and for manoeuvring in narrow/water.

**Clause 61**

Charterers and/or their agent to be authorized by the Master to sign Bill(s) of Lading on his behalf in accordance with Mate's and/or Tally Clerk's receipts without prejudice to this Charter Party.



Charterers are to be liable for and shall indemnify Owners against any losses, damages, delays, costs, expenses, claims or other consequences arising as result of Bills of Lading being signed by Charterers or their agents, or the master at their request, which do not comply with the provisions of this Charter party.

Charterers to indemnity Owners for any inconsistency between Mate's Receipts and Bills of Lading.

No through transhipment or combined transport Bills of Lading and no waybills/liner Bills of Lading are to be issued under this Charter party.

**Clause 62**

Deleted.

**Clause 63**

Time on delivery/redelivery to be based on G.M.T. both ends.

**Clause 64**

Vessel's holds on delivery to be clean swept/washed down by fresh water and dried up so as to receive Charterers' intended cargoes in all respects to the Charterers' satisfaction.
If vessel fails inspection at first loading port vessel to be considered off-hire from time of rejection and all fuel consumed and extra cleaning expenses/time until vessel's all holds pass inspection to receive Charterers' intended cargo to be for owners' account.

**Clause 65**

In no case will be Charterers be responsible for any act of smuggling or drug abuse by any member of the crew.

**Clause 66     On-hire and Off-hire Surveys**

Joint on-hire and off-hire surveys are to be held to ascertain the quantities of bunkers on delivery and redelivery respectively as well as vessel's condition.
The on-hire survey is to be held at the first port delivery. The off-hire survey is to be held at the redelivery port in Charterers' time.
Any independent surveyor is to be appointed for both Charterers and Owners and expenses are to be shared equally between Owners and Charterers.
Vessel only to be off-hire for actual working time lost due to surveys.

**Clause 67**

The Charterers have the liberty to appoint ocean routes service in which case the Master to comply with the reporting procedure of such service and follow their recommendations subject to his discretion in light of the local conditions prevailing. In the event of consistent discrepancy between ocean routes report and vessel's log book, the ocean routes final voyage report to be taken as ruling.


**M.V. "SEA PRIDE"**
**CHARTER PARTY DATED 9ᵗʰ JUNE, 2006**
**ADDITIONAL CLAUSES**



**Clause 68**

Owners/Master to give notice on fixing and after fully fixed of vessel's estimated time of delivery to cable address "BRAVMAR ATHENS", fax : 00 30 210 6250.018/19 or E-mail maritime@brave.gr.

**Clause 69**

Liabilities for cargo claims shall be borne by Owners/Time-Charterers in accordance with New York Produce Exchange Interclub agreement in February 1970 and reprints of May 1984 and 1996 and subsequent amendments.

**Clause 70**

In case original Bill(s) of Lading not available prior to vessel's arrival at discharge port Owners to allow discharge/delivery of the cargo against Charterers' Letter of Indemnity. In Owners P and I Club standard wording issued on the Charterers letter head and stamped/signed by a designated official of the Charterers only, without bank counter signature. The Charterers will fax the Letter of Indemnity together with copy of Bill(s) of Lading which have been issued to Owners office in Greece (fax number: 00 30 210 6199946) for their approval. Thereafter the Charterers will immediately send by courier mail the original Letter of Indemnity, faxing also the courier airway bill to Owners managers. This procedure to take place promptly enough prior to vessel arrival at destination, being understood that the Owners will instruct the Master to release the cargo only after having found all in order and having received Charterers' fax with the courier Airway Bill. Furthermore the Charterers hereby undertake the obligation to mail the original accomplished Bill(s) of Lading to Owners managers when same available after redelivery in which case they will courier the Letter of Indemnity back to same available after redelivery in which case they will courier the Letter of Indemnity back to Charterers.

This clause applies accordingly in case of changing destination/port other that stated in Bill(s) of Lading.

**Clause 71**

Owners guarantee that vessel's holds are to be clear of any fitting/superstructure such as cardeck curtain plates, containers fitting whatsoever.

**Clause 72**

CARGO SEPARATION
Any cargo separation other than by vessel's natural separation to be for Charterers' time/risk and expenses.

**Clause 73**

Charterers' P and I Club is the West of England where they are fully covered for cargo claims, freight/demurrage and defence and Charterers' liability.





**M.V. "SEA PRIDE"**
**CHARTER PARTY DATED 9th JUNE, 2006**
**ADDITIONAL CLAUSES**

**Clause 74**

Owners guarantee that vessel's hatch-covers are to be watertight all throughout this Charter period and if any hatch-cover found defective, same to be rectified at Owners' time and expenses to vessel's class surveyor satisfaction. Charterers also have the right to can out chalk test on all hatches at any time during this Charter.

**Clause 75**

It is understood that, if necessary, vessel will comply with any safely regulations and/or requirements in effect at ports of loading and/or discharging. A particular reference is to be made to the United States Department of Labour Safety and Health Regulation set forth in part II of the Federal Register.

Although other provision of this time Charter make it the responsibility of the Owners, it is agreed that should the vessel not meet safety rules and regulations. Owners will make immediate corrective measures and any stevedore standby time and other directly related expenses involved, including time lost will be for the Owners' account.

Charterers have the right to inspect the vessel's cargo holds at any time provided sufficient notice is given to Owners of such intention, the Owners or Master giving every facility and assistance to carry out his inspection, without interrupting working of the vessel and without incurring expenses to Owners.

Charterers' agents to attend to vessel's customary ordinary minor matters without charging agency fee but cost of actual items to be for Owners' account.

In case of major repairs General Average etc., then Owners to appoint own agents or Charterers' agents paying agency fee as per normal tariff.

If the vessel calls at any US port for the purpose of loading or discharging cargo vessel's gear and all other equipment shall comply with regulations established by US Public Law 85-742, Part 9 (Safety and Health Regulations for longshoring).

If longshoremen are not permitted to work due to failure of the Master and/or Owners and Owners' Agents to comply with the aforementioned regulations, any delay resulting therefrom and additional expenses occurring as a result then to be for Owners account.

**Clause 76**

It is understood that good weather conditions mean condition of wind maximum Beaufort Scale 4 and sea conditions maximum Douglas Sea State 3, major ocean current factor to be reflected to be speed performance.

**Clause 77**

This Charter Party shall be governed by and construed in accordance with English Law.





**Clause 78    U.S. trade - Unique Bill of Lading Identifier Clause**

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the U.S.A. shall have been endorsed with a unique Bill of Lading identifier as required by the U.S.A. Customs Regulations (19 CRF Part 4 Section 4.7A.) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this clause shall amount to a breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of Charterers' breach of the provisions of this clause shall be for the Charterers' account.

**Clause 79    Tax on Earning Under the Charter**

Any taxes levied by any government or authority, other than the government or authorities of the country of the Owners' domicile of the vessel's flag, in respect of the earnings of the vessel under this Charter Party shall be for Charterers' account.

**Clause 80    Double Banking, Lightering and Transhipment**

The vessel is not to be required to double-bank and is not to be used for transhipment operations during the currency of this Charter.

**Clause 81    Bills of Lading**

The Master is to sign Bills of Lading as presented based onshore/elevator figures without prejudice to the terms, conditions and exceptions of this Charter Party. If the Master elects to delegate the signing of Bills of Lading in strict conformity with mates receipts to his agents he shall give them such power of attorney in writing on agents standard form of authorization a copy of which is to be furnished to Charterers.

Owners to release Bills of Lading for cargo shipped on board for such quantity as may be required by Charterers prior to vessel's completion of loading against payment by Charterers of corresponding freight.

Clean mates receipts to be signed for each parcel of cargo when on board, and Master to sign Bills of Lading in accordance therewith as requested by Charterers/shippers or their agents. Master to reject any cargo that would involve the clausing of Mates receipts and/or Bills of Lading.

**Clause 82    Resumption of Hire**

Notwithstanding any provisions elsewhere in this Charter to the contrary, when following a period during which for whatever reason, the vessel has been placed off-hire or hire has been suspended she comes back on hire at and/or resumes her voyage from, a position nearer to her original destination then the position at which she went off-hire or hire was suspended, Owners are to receive credit for the steaming time and busters so saved, even if the vessel is nearer her original destination as a result of having been towed.



**Clause 83    Hamburg Rules**

Neither the Charterers nor their agents shall permit the issue of any Bills of Lading or waybills or other documents evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers behalf or on behalf of the sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg

Rules or any other legislation imposing liabilities in excess of Hague or Hague / Visby Rules. The Charterers shall indemnify the Owners against any liability, loss or damage, which may result from any breach of the foregoing provisions of this Clause.

**Clause 84    BIMCO Arbitration Clause**    ......... .

This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators association (LMAA) Terms current at the time when the arbitration proceedings are commenced. The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement. The arbitrators shall be shipping commercial men, members of the LMAA and the Baltic Exchange Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

Notwithstanding the above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract. In the case of a dispute in respect of which arbitration has been commenced, the following shall apply:

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.





(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

## Clause 85

Provided vessel's strengths permit and subject to Master's discretion/satisfaction Charterers have the option to discharge by the use of vacuvators which may by placed on deck or if there is luck of deck space same to be placed on hatch-covers.

## Clause 86

Any delays to the vessel on account of ice/icy conditions and/or icing, freezing of vessel's deck equipment and machinery which may become inoperative in lieu thereof to be for the time Charterers' account and the vessel to remain on hire for all time thereby lost.

## Clause 87

Deleted.

## Clause 88

The Charterers to supply bunkers with quality in conformity with maximum 380 CST RMG15 and MDO Distillate.

## Clause 89

Deleted.

## Clause 90

See Clause 71.

## Clause 91

All negotiations and fixture to be kept strictly private and confidential.

26-JAN-2007 12:37 FROM HELLENIC STAR SHIPPING TO 2104291207 P.35



**Clause 92**

Deleted.

**Clause 93    USDA/NCB Clause**

Owners guarantee that vessel free from Asian Gypsy Moth and never called CIS pacific port for last three years otherwise Owners to be responsible for any consequences caused therefrom. Furthermore, Owners guarantee that vessel meets all national cargo bureau United States Department of agriculture plaid protection and quarantine office regulation.

**Clause 94**

Owners have the right to sell the vessel at any time during the period of this charter party, which to remain in full force with the new Owners, but Owners should get Charterers' prior consent which not to be unreasonably withheld.

**Clause 95    BIMCO I.S.M Clause**

From the date of coming into force of the International Safety Management (ISM) Code in relation of the vessel and thereafter during the currency of this Charter Party, the Owners shall produce that both the vessel and "the company" (as defined by the ISM Code) shall comply with the requirement Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expenses or delays caused by failure on the part of the Owners or "the company" to comply with the ISM Code shall be for the Owners' account.

**Clause 96**

Deleted.

**Clause 97**

Deleted.

**Clause 98**

Charterers guarantee that the cargo loaded with destination Iraq is U.N. approved and any/all documentation required for this matter will be provided by Charterers at their time and expenses.

**Clause 99**

Owners guarantee vessel has not called CIS Pacific last 24 months nor Cuban port(s) in last 6 months.





**Clause 100**

Owners guarantee vessel is fully in accordance with ISM requirements and conditions for all posts and countries and shall remain so for the whole duration of this Charter.

**Clause 101**

Deleted.

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

## NEW BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

## BOTH-TO-BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."





**BIMCO Standard Year 2000 Clause (For Voyage and Time Charter Parties)**

"Year 2000 conformity" shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be affected by dates prior to or during the Year 2000.

Without prejudice to their other rights, obligations and defences under this Charter Party including, where applicable, those of the Hague or Hague-Visby Rules, the Owners and the Charterers, and in particular the Owners in respect of the vessel, shall exercise due diligence in ensuring Year 2000 conformity in so far as this has a bearing on the performance of this Charter Party.

## GENERAL PARAMOUNT CLAUSE

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the international convention, dated Brussels, 25th August, 1924 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such terms shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to Limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability.

## P & I NUCLEAR CLAUSE

Notwithstanding any other provisions whether written or printed contained in this Charter it is agreed that nuclear fuel and radioactive products or waste are specifically excluded from the cargo permitted to be loaded or carried under this Charter Party. This exclusions does not apply to radio isotopes used or intended to be used to any industrial, commercial, agricultural, medical or scientific purpose, provided Owners' prior approval has been obtained to the loading thereof.

## P. & I. Bunker Deviation Clause

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named or nominated in or under this Charter party and there take oil bunkers in any quantity in the discretion of Charterers even to the full capacity of fuel tanks, and any other compartment in which oil can be carried whether such amount is or is not required for the intended voyage.

(ii) To comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) To comply with the terms of any resolution of the Security Council of the united nations, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) To discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;.

(v) To call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this clause, the owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

## ISPS Clause For Time Charter Parties

(a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/ Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision.

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted, under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

COPY

"M. V. 'SEA PRIDE.'"
## CHARTER PARTY DATED 9th JUNE, 2006
## ADDITIONAL CLAUSES

**CONWARTIME 2004**

a) For the purpose of this clause, the words:

(i) Owners shall include the Shipowners, bareboat Charterers, Disponent owners, managers or other operators who are charged with the management of the vessel, and the master; and

(ii) War risks shall include any actual, threatened or reported: war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the government of any state whatsoever, which, in the reasonable judgement of the master and/or the owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

(b) The vessel, unless the written consent of the owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the master and/or the owners, may be, or are likely to be, exposed to war risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d) (i) The owners may effect war risks insurance in respect of the hull and machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and indemnity risks), and the premiums and/or calls therefor shall be for their account.

(ii) If the underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such underwriters as being subject to additional premiums because of war risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) Crew war bonus if any to be for Owners' account.

(f) The vessel shall have liberty:-

(i) To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

# EXHIBIT B

 **BRAVE BULK TRANSPORT LTD. OF LIBERIA**

11/01/2008

| FIXTURE NOTE | |
|---|---|
| Vessel | : m/v "TE HO" |
| Owners | : FIVE OCEAN CORPORATION OF SEOUL, KOREA |
| Charterers | : BRAVE BULK TRANSPORT LTD. OF LIBERIA |
| Brokers | : M&F CHARTERING S.A. |
| Charter Party Dated | : 10.01.2008 |

Vessel's Description: m.v. 'TE HO' (under Coa No. BV01/08)

PAN FLAG BLT 2004/ 77,834 MT DWT ON 1 4. 122 M SSW
GRT/NRT 41,372 / 26,094/ LOA/BM  225.0 /32.26 M
HATCH COVER : 2 PANNEL, SIDE ROLLING TYPE
7 HO/7HA, 92,151CBM GR CAPA
H/SIZE : NO.1  17.10 X 13.36M
         NO.2-7 17.00 X 15.03M
GRAIN CAPA :
NO.1  12,827 M3
NO.2  13,531 M3
NO.3  13,306 M3
NO.4  13,328 M3
NO.5  13,364 M3
NO.6  13,332 M3
NO.7  12,460 M3
TOTAL GRAIN CAPACITY : 92,151 M3
SPEED/CONS :
ABOUT 14.0 KTS LADEN/ABOUT 15.0 KTS BALLAST (UNDER GOOD WEATHER CONDITIONS
NOT EXCEEDING BEAUFORT WIND FORCE 4 / DOUGLAS SEA STATE 3 AND FREE OF ANY
ADVERSE CURRENTS.)
CONSUMPTION :
AT SEA  - FO (IFO  380 CST) ABT 36.5 MT +  DO ABT 0.3 MT PER DAY
IN PORT - IDLE IFO ABT  2.5MT + DO ABT 0.3MT PER DAY/ WORKING IFO 3.5MT + MDO
0.3MT PER DAY
AT INTERMEDIATE CLIMATE CONDITION (PLUS ADDITIONAL DO 0.5MT/DAY AT COLD
CLIMATE CONDITION)
VESSEL HAS LIBERTY OF USING MDO WHEN MANOEUVERING IN/OUT OF PORTS, NAVIGATING
IN SHALLOW OR RESTRICTED OR BUSY WATERS, CANALS, RIVERS, ESTUARIES AND/OR IN
FOGGY WEATHER AND ALSO DURING HOLD   CLEANING/BALLASTING OPERATIONS.
AA WOG

1

## BRAVE BULK TRANSPORT LTD. OF LIBERIA

## Delivery

DROPPING LAST OUTWARD SEA PILOT 1SP WCI ITALY NOT EAST OF PASSERO PORT IN OWNS' OPTION ANY TIME DAY OR NIGHT, SUNDAYS AND HOLIDAYS INCLUDED

## Laydays/ Cancelling

0001HRS 10TH/2359HRS 15TH JANUARY 2008 BFC CANCELLATION CLAUSE TO APPLY (ETA LA SPEZIA 6TH JAN;ETC/D 11TH JAN)

## Time Charter Description

FOR ONE TIME CHARTER TRIP VIA SPS/SBS/SAS VIA USG TO IRAQ WITH WHEAT IN BULK (U.N. APPROVED CARGO ONLY FOR IRAQI PORT(S))

## Redelivery

PASSING MUSCAT OUTBOUND ANY TIME DAY OR NIGHT, SUNDAYS AND HOLIDAYS INCLUDED

## Hire

USD 85,000 DAILY INCLUDING OVERTIME, HIRE PAYABLE EVERY 15 DAYS IN ADVANCE
1ST HIRE PLUS VALUE OF BOD PAYABLE W/I 2 BANKING DAYS AFTER VESSEL'S DELY.

## Bunker Clause

BOD QTY ABT 1,200MT IFO & ABT 80-100MT MDO.
BOR QTY ABT SAME AS ON DELY
PRICES BENDS USD500/USD800 PMT FOR IFO/MDO RESPECTIVELY.
OWRS TO BUNKER VSL UPTO ABOVE DEL QUANTITY AT GIBRALTAR OR LAS PALMAS,
TIME/COST TO BE FOR OWRS' ACCT. IN CASE CHTRS ALSO SUPPLY BUNKER AT GIBRALTAR
OR LAS PALMAS,THEN TIME/COST TO BE SHARED ON PRO-RATA BSS.

## Commission

5.00 PCT TOTAL (3,75PCT ADDRESS + 1,25PCT COMMISSION TO BE SPLIT BETWEEN MNF CHARTERING & SMC)

## Remarks:

> ILOHC USD 5,000 LUMPSUM

 **BRAVE BULK TRANSPORT LTD. OF LIBERIA**

- C/V/E USD 1,250 PER 30 DAYS OR PRORATA

- *L.O.I: THE CHARTERERS HEREBY STATE THAT THEY WILL INDEMNIFY THE OWNERS IN ACCORDANCE WITH THE OWNERS P&I CLUB WORDING AGAINST ALL CONSEQUENCES ARISING FROM THE OWNERS CONFORMING TO THE CHARTERERS REQUEST TO RELEASE CARGO WITHOUT ORIGINAL BILLS OF LADING. THE CHARTERERS HEREBY SURRENDER A LETTER OF INDEMNITY TO THE OWNERS STRICTLY CONFORMING WITH THE OWNERS P&I CLUB WORDING WITHOUT BANK GUARANTEE.*

- OWS TO ADVISE HOW MUCH CARGO THE VSL CAN LOAD AT STOWAGE FACTOR 42'/42',50" AT 10,5M SWAD AT IRAQ WITHOUT REQUIRING ANY BAGGING/STRAPPING/SECURING.

- *BIMCO STANDARD "BUNKER FUEL SULPHUR CONTENT CL" & "ISPS/MTSA CL" & "US CUSTOMS ADVANCE/AMS CL" TO BE INSERTED INTO THE C/P, CONTENT AS BELOW:*

- *BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005:*

(A) WITHOUT PREJUDICE TO ANYTHING ELSE CONTAINED IN THIS CHARTER PARTY, THE CHARTERERS SHALL SUPPLY FUELS OF SUCH SPECIFICATIONS AND GRADES TO PERMIT THE VESSEL, AT ALL TIMES, TO COMPLY WITH THE MAXIMUM SULPHUR CONTENT REQUIREMENTS OF ANY EMISSION CONTROL ZONE WHEN THE VESSEL IS ORDERED TO TRADE WITHIN THAT ZONE.

THE CHARTERERS ALSO WARRANT THAT ANY BUNKER SUPPLIERS, BUNKER CRAFT OPERATORS AND BUNKER SURVEYORS USED BY THE CHARTERERS TO SUPPLY SUCH FUELS SHALL COMPLY WITH REGULATIONS 14 AND 18 OF MARPOL ANNEX VI, INCLUDING THE GUIDELINES IN RESPECT OF SAMPLING AND THE PROVISION OF BUNKER DELIVERY NOTES.

THE CHARTERERS SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE OWNERS IN RESPECT OF ANY LOSS, LIABILITY, DELAY, FINES, COSTS OR EXPENSES ARISING OR RESULTING FROM THE CHARTERERS' FAILURE TO COMPLY WITH THIS SUB-CLAUSE (A).

(B) PROVIDED ALWAYS THAT THE CHARTERERS HAVE FULFILLED THEIR OBLIGATIONS IN RESPECT OF THE SUPPLY OF FUELS IN ACCORDANCE WITH SUB-CLAUSE (A), THE OWNERS WARRANT THAT:

(I) THE VESSEL SHALL COMPLY WITH REGULATIONS 14 AND 18 OF MARPOL ANNEX VI AND WITH THE REQUIREMENTS OF ANY EMISSION CONTROL ZONE; AND
(II) THE VESSEL SHALL BE ABLE TO CONSUME FUELS OF THE REQUIRED SULPHUR CONTENT

WHEN ORDERED BY THE CHARTERERS TO TRADE WITHIN ANY SUCH ZONE.

SUBJECT TO HAVING SUPPLIED THE VESSEL WITH FUELS IN ACCORDANCE WITH SUB-CLAUSE (A), THE CHARTERERS SHALL NOT OTHERWISE BE LIABLE FOR ANY LOSS, DELAY, FINES, COSTS OR EXPENSES ARISING OR RESULTING FROM THE VESSEL'E FAILURE TO COMPLY WITH REGULATIONS 14 AND 18 OF MARPOL ANNEX VI.

(C) FOR THE PURPOSE OF THIS CLAUSE, "EMISSION CONTROL ZONE" SHALL MEAN ZONES AS

STIPULATED IN MARPOL ANNEX VI AND/OR ZONES REGULATED BY REGIONAL AND/OR NATIONAL AUTHORITIES SUCH AS, BUT NOT LIMITED TO, THE EU AND THE US ENVIRONMENTAL PROTECTION AGENCY.

➤ _ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005:_

(A)(I) THE OWNERS SHALL COMPLY WITH THE REQUIREMENTS OF THE INTERNATIONAL CODE FOR THE SECURITY OF SHIPS AND OF PORT FACILITIES AND THE RELEVANT AMENDMENTS TO

CHAPTER XI OF SOLAS (ISPS CODE) RELATING TO THE VESSEL AND VHE COMPANY?(AS DEFINED BY THE ISPS CODE). IF TRADING TO OR FROM THE UNITED STATES OR PASSING THROUGH UNITED STATES WATERS, THE OWNERS SHALL ALSO COMPLY WITH THE REQUIREMENTS OF THE US MARITIME TRANSPORTATION SECURITY ACT 2002 (MTSA) RELATING TO THE VESSEL AND THE OWNER (AS DEFINED BY THE MTSA).

(II) UPON REQUEST THE OWNERS SHALL PROVIDE THE CHARTERERS WITH A COPY OF THE RELEVANT INTERNATIONAL SHIP SECURITY CERTIFICATE (OR THE INTERIM INTERNATIONAL SHIP SECURITY CERTIFICATE) AND THE FULL STYLE CONTACT DETAILS OF THE COMPANY SECURITY OFFICER (CSO).

(III) LOSS, DAMAGES, EXPENSE OR DELAY (EXCLUDING CONSEQUENTIAL LOSS, DAMAGES, EXPENSE OR DELAY) CAUSED BY FAILURE ON THE PART OF THE OWNERS OR VHE COMPANY?EWNER?TO COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE/MTSA OR THIS CLAUSE SHALL BE FOR THE OWNERS?ACCOUNT, EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY.

(B)(I) THE CHARTERERS SHALL PROVIDE THE OWNERS AND THE MASTER WITH THEIR FULL STYLE CONTACT DETAILS AND, UPON REQUEST, ANY OTHER INFORMATION THE OWNERS REQUIRE TO COMPLY WITH THE ISPS CODE/MTSA. WHERE SUB-LETTING IS PERMITTED UNDER

THE TERMS OF THIS CHARTER PARTY, THE CHARTERERS SHALL ENSURE THAT THE CONTACT DETAILS OF ALL SUB-CHARTERERS ARE LIKEWISE PROVIDED TO THE OWNERS AND THE MASTER. FURTHERMORE, THE CHARTERERS SHALL ENSURE THAT ALL SUB-CHARTER PARTIES THEY ENTER INTO DURING THE PERIOD OF THIS CHARTER PARTY CONTAIN THE FOLLOWING PROVISION:

6THE CHARTERERS SHALL PROVIDE THE OWNERS WITH THEIR FULL STYLE CONTACT DETAILS AND, WHERE SUB-LETTING IS PERMITTED UNDER THE TERMS OF THE CHARTER PARTY, SHALL

ENSURE THAT THE CONTACT DETAILS OF ALL SUB-CHARTERERS ARE LIKEWISE PROVIDED TO THE OWNERS

(II) LOSS, DAMAGES, EXPENSE OR DELAY (EXCLUDING CONSEQUENTIAL LOSS, DAMAGES, EXPENSE OR DELAY) CAUSED BY FAILURE ON THE PART OF THE CHARTERERS TO COMPLY

4

 **BRAVE BULK TRANSPORT LTD. OF LIBERIA**

WITH THIS CLAUSE SHALL BE FOR THE CHARTERERS ACCOUNT, EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY.

(C) NOTWITHSTANDING ANYTHING ELSE CONTAINED IN THIS CHARTER PARTY ALL DELAY, COSTS OR EXPENSES WHATSOEVER ARISING OUT OF OR RELATED TO SECURITY REGULATIONS OR MEASURES REQUIRED BY THE PORT FACILITY OR ANY RELEVANT AUTHORITY IN ACCORDANCE WITH THE ISPS CODE/MTSA INCLUDING, BUT NOT LIMITED TO, SECURITY GUARDS, LAUNCH SERVICES, VESSEL ESCORTS, SECURITY FEES OR TAXES AND INSPECTIONS , SHALL BE FOR THE CHARTERERS?ACCOUNT, UNLESS SUCH COSTS OR EXPENSES RESULT SOLELY FROM THE NEGLIGENCE OF THE OWNERS, MASTER OR CREW. ALL MEASURES REQUIRED BY THE

OWNERS TO COMPLY WITH THE SHIP SECURITY PLAN SHALL BE FOR THE OWNERS?ACCOUNT.

(D) IF EITHER PARTY MAKES ANY PAYMENT WHICH IS FOR THE OTHER PARTY'E ACCOUNT ACCORDING TO THIS CLAUSE, THE OTHER PARTY SHALL INDEMNIFY THE PAYING PARTY.

FOOTNOTE: THIS CLAUSE REPLACES PREVIOUSLY PUBLISHED ISPS CLAUSE FOR TIME CHARTER PARTIES AND THE US SECURITY CLAUSE FOR TIME CHARTER PARTIES, BOTH OF WHICH ARE NOW OFFICIALLY WITHDRAWN.

### ➢ *U.S. CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE FOR TIME CHARTER PARTIES:*

(A) IF THE VESSEL LOADS OR CARRIES CARGO DESTINED FOR THE US OR PASSING THROUGH US PORTS IN TRANSIT, THE CHARTERERS SHALL COMPLY WITH THE CURRENT US CUSTOMS REGULATIONS (19 CFR 4.7) OR ANY SUBSEQUENT AMENDMENTS THERETO AND SHALL UNDERTAKE THE ROLE OF CARRIER FOR THE PURPOSES OF SUCH REGULATIONS AND SHALL, IN THEIR OWN NAME, TIME AND EXPENSE:

I) HAVE IN PLACE A SCAC (STANDARD CARRIER ALPHA CODE);
II) HAVE IN PLACE AN ICB (INTERNATIONAL CARRIER BOND);
III) PROVIDE THE OWNERS WITH A TIMELY CONFIRMATION OF I) AND II) ABOVE; AND
IV) SUBMIT A CARGO DECLARATION BY AMS (AUTOMATED MANIFEST SYSTEM) TO THE US CUSTOMS AND PROVIDE THE OWNERS AT THE SAME TIME WITH A COPY THEREOF.

(B) THE CHARTERERS ASSUME LIABILITY FOR AND SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE OWNERS AGAINST ANY LOSS AND/OR DAMAGE WHATSOEVER (INCLUDING CONSEQUENTIAL LOSS AND/OR DAMAGE) AND/OR ANY EXPENSES, FINES, PENALTIES AND ALL

OTHER CLAIMS OF WHATSOEVER NATURE, INCLUDING BUT NOT LIMITED TO LEGAL COSTS, ARISING FROM THE CHARTERERS FAILURE TO COMPLY WITH ANY OF THE PROVISIONS OF SUB-CLAUSE (A). SHOULD SUCH FAILURE RESULT IN ANY DELAY THEN, NOTWITHSTANDING ANY PROVISION IN THIS CHARTER PARTY TO THE CONTRARY, THE VESSEL SHALL REMAIN ON HIRE.

 **BRAVE BULK TRANSPORT LTD. OF LIBERIA**

(C) IF THE CHARTERERS' ICB IS USED TO MEET ANY PENALTIES, DUTIES, TAXES OR OTHER CHARGES WHICH ARE SOLELY THE RESPONSIBILITY OF THE OWNERS, THE OWNERS SHALL PROMPTLY REIMBURSE THE CHARTERERS FOR THOSE AMOUNTS.

(D) THE ASSUMPTION OF THE ROLE OF CARRIER BY THE CHARTERERS PURSUANT TO THIS CLAUSE AND FOR THE PURPOSE OF THE US CUSTOMS REGULATIONS (19 CFR 4.7) SHALL BE WITHOUT PREJUDICE TO THE IDENTITY OF CARRIER UNDER ANY BILL OF LADING, OTHER CONTRACT, LAW OR REGULATION.
///

**Bank Details**

**BENEFICIARY: FIVE OCEAN CORPORATION
RESIDENCE: SEOSOMUN, SEOUL
COUNTRY: KOREA
BANK ACCOUNT NUMBER:650-005142-685
SWIFT CODE: KOEXKRSE
BANKERS: KOREA EXCHANGE BANK, SEOSOMUN BRANCH**
///

G. LEVENTIS
DIRECTOR CHARTERING DEPARTMENT

I HAVE SEEN THE NEGOTIATIONS EXAMINE
THEM AND APPROVE THEM.

N.H.VAFIAS
*MANAGING DIRECTOR*

# EXHIBIT C

# IFCHOR S.A.

SHIPBROKERS & CHARTERING AGENTS

SECURITIES & FFA DIVISION
PLACE PÉPINET 1 — CH-1003 LAUSANNE, SWITZERLAND
TEL. +41 21 310 3131 — FAX +41 21 310 3100
E-MAIL: securities@ifchor.ch



## FORWARD FREIGHT AGREEMENT BROKERS ASSOCIATION ("FFABA")

## FORWARD FREIGHT AGREEMENT FFABA 2007 TERMS

**Trade Ref:**      8.909.0.LdVe.TC/Ifchor
**Contract Date:**      Tuesday, September 9, 2008

The purpose of this confirmation is to state the terms and conditions of the forward freight swap agreement entered into between:

**Seller**
**Transfield – ER Futures Ltd., Seoul., Panama guaranteed by Transfield Shipping Inc., Panama**
c/o Transfield - ER Resources Ltd., Hong Kong
Room 1738 17F Sun Hung Kai Centre
30 Harbour Road
Wonchai - Hong Kong
Tel N. + 852 28 27 08 89
Fax N. + 852 28 27 09 36
Email. christian.norup@transfield-er.com
P.I.C. Christian Norup

     and

**Buyer**
**BBT (Brave Bulk Transport) Ltd., Monrovia**
**C/o BBT (Brave Bulk Transport) Ltd., Malta**
Apollon Business Center Bldg
331, Kifisias Avenue
Kifisia - Greece
Tel N. + 30 210 625 00 31
Fax N. + 30 210 625 00 18
Email. drychart@brave.gr
P.I.C. George Leventis

1

The agreement between the parties set out in this Confirmation is a Confirmation pursuant to the Master Agreement.

In this Confirmation, **"Master Agreement"** has the meaning given to it in clause 9 if that clause applies, and if it does not, means any master agreement by which the Transaction entered into pursuant to and in accordance with this Confirmation is governed.

Until superseded by notice information in a subsequent Confirmation or other communication, the above addresses are hereby recognized as the correct addresses to which any notification under this Confirmation may be properly served.

The terms of this Confirmation are as follows:

1) **Contract Route(s):**

As per the arithmetical average of the **Routes 1A, 2A, 3A and 4** [Transatlantic TC Round Voyage, TC Trip Out, Transpacific TC Round Voyage, TC Trip Back] of the **Baltic Panamax Index** as defined by the Baltic Exchange on the Contract Date and any route replacing or substituting that route subsequently published by the Baltic Exchange on or before the Settlement Date and with effect from the date of such replacement or substitution.

2) **Contract Rate:**      USD 44'000.00 per day.

3) **Contract Quantity:**  182.5 days (see below)

4) **Contract Months:**    January 2009 (15.5 days) - February 2009 (14 days) -
March 2009 (15.5 days) - April 2009 (15 days) - May
2009 (15.5 days) - June 2009 (15 days) - July 2009
(15.5 days) - August 2009 (15.5 days) - September 2009
(15 days) - October 2009 (15.5 days) - November 2009
(15 days) - December 2009 (15.5 days)

5) **Settlement Date:**

The last Baltic Exchange Index publication day of each Contract Month.

6) **Settlement Rate:**

(a)   Each settlement rate (the **"Settlement Rate"**) shall be the unweighted average of the rates for the Contract Route(s) published by the Baltic Exchange over each

2

Settlement Period (defined as all Baltic Exchange Index publication days of each applicable Contract Month up to and including the Settlement Date).

(b) If for any reason the Baltic Exchange cannot provide any rate required for establishing the Settlement Rate, then the current chairman of the FFABA may be instructed by either party to form a panel comprising of a minimum of three independent brokers (the "Panel") to determine an appropriate rate, which determination will be final and binding on both parties.

(c) Each party shall bear its own costs and expenses in connection with any determination made pursuant to this clause 7.

(d) The parties shall severally indemnify and hold harmless each of the members of the Panel, the Baltic Exchange and its members and the FFABA and its members (the "Indemnified Persons") against all liabilities, actions, demands, costs and expenses incurred by any of them arising directly or indirectly out of or in connection with the formation of the Panel and any determination made by the Panel.

(e) As between the parties, each party shall have a right of contribution against the other party in respect of any indemnity payment made pursuant to the preceding paragraph so that their respective liabilities pursuant to that paragraph shall be equal.

7) **Settlement Sum:**

The **"Settlement Sum"** is the difference between the Contract Rate and the Settlement Rate multiplied by the Quantity by Contract Month. If the Settlement Rate is higher than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is lower than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

8) **Payment Procedure and Obligations:**

(a) Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or five (5) London business days after the Settlement Date and for this purpose a **"London business day"** means a day (other than a Saturday or Sunday) on which commercial banks are open for business in London). The Settlement Sum will be deemed "paid" when it has been received into the bank account designated by the payee.

(b) Payment of the Settlement Sum shall be made telegraphically, in full, in United States dollars. The costs incurred in effecting payment shall be for the account of the payer. Payment may only be effected directly between the parties. The Settlement Sum shall be paid without any deduction or set-off except as permitted pursuant to the Master Agreement or otherwise as agreed by the Buyer and the Seller in writing.

3

9) **ISDA Master Agreement:**

This clause 9 applies only if either:

(i) this Confirmation does not already constitute a Confirmation under an existing master agreement entered into by the parties to this Confirmation; or

(ii) the parties agree, either by virtue of clause 20 or otherwise, that the terms of the Master Agreement that is constituted by this clause are to replace any such existing master agreement.

This Confirmation constitutes and incorporates by reference the provisions of the 1992 ISDA® Master Agreement (Multicurrency – Cross Border) (without Schedule) as if they were fully set out in this Confirmation and with only the following specific modifications and elections:

(a) Section 2(c)(ii) shall not apply so that a net amount due will be determined in respect of all amounts payable on the same date in the same currency in respect of two or more Transactions;

(b) Seller is the Calculation Agent except where the Seller is the Defaulting Party in which event Buyer is the Calculation Agent;

(c) the most current published set of ISDA® Commodity Definitions and ISDA® Definitions shall apply;

(d) Credit Event Upon Merger is applicable to both parties;

(e) for the purposes of payments on Early Termination, Loss will apply and the Second Method will apply;

(f) Automatic Early Termination will apply to both parties;

(g) the Termination Currency is United States dollars;

(h) the Applicable Rate shall mean the one month USD-LIBOR plus 2%, reset daily and compounded monthly;

(i) Local Business Day or banking day shall each refer to such a day in London;

(j) such other modifications as shall be necessary for such incorporation;

(k) references to "this Master Agreement", "this Agreement", "herein" and other like expressions shall be construed as being references to this Confirmation incorporating such provisions,

4

and this Confirmation, including such incorporated provisions, shall govern the Transaction referred to in this Confirmation and any other Transaction referred to in clauses 20 and 21.

The agreement constituted and incorporated by the incorporation of the provisions of the 1992 ISDA® Master Agreement (Multicurrency - Cross Border) (without Schedule) pursuant to this clause is referred to in this Confirmation as the **"Master Agreement"**.

10) **Capacity and Good Standing:**

In line with and in addition to (as appropriate) the representations contained in Section 3 of the Master Agreement, each party represents to the other party that:

(a) it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation, and is solvent and in good standing;

(b) it has the power to execute, deliver, and perform this Confirmation;

(c) all governmental and other consents that are required to have been obtained by it with respect to this Confirmation have been obtained and are in full force and effect and all conditions of any such consents have been complied with;

(d) in the event that a party to this Confirmation is a person organized under, domiciled in, or having its principal place of business in, the United States, each party represents to the other party that it is an "eligible contract participant" as defined in § 1a(12) of the Commodity Exchange Act (7 U.S.C. § 1a(12), as amended).

11) **Telephone Recording:**

Each party consents to the recording of telephone conversations in connection with this Confirmation.

12) **Commission:**

Each of the parties agrees to pay brokers' commission to any broker (a "Broker") as agreed with any Broker.

13) **Non-Assignability:**

Except as provided in Section 7 of the Master Agreement, this Confirmation is non-assignable unless otherwise agreed in writing between the parties to this Confirmation.

14) **Principal To Principal:**

5

This Confirmation is a principal to principal agreement with settlement directly between the two parties. Both parties agree that **Ifchor SA** shall be under no obligation or liability in relation to this Confirmation. Both parties agree jointly and severally to indemnify and hold harmless **Ifchor SA** against all actions, including but not limited to all claims, demands, liabilities, damages, costs and expenses both from the two parties and any third party. Claims, demands, liabilities, damages, costs and expenses suffered or incurred are to be settled directly by or between the two parties.

15) **Law and Jurisdiction:**

This Confirmation shall be governed by and construed in accordance with English law and shall be subject to the exclusive jurisdiction of the High Court of Justice in London, England. The terms of Section 12(a) of the Master Agreement notwithstanding, proceedings may be validly served upon either party by sending the same by ordinary post and/or by fax to the addresses and/or fax numbers for each party given above.

16) **Entire Agreement:**

This Confirmation and the Master Agreement set out the entire agreement and understanding of the parties with respect to the subject matter of this Confirmation and supersede all oral communication and prior writings with respect thereto.

17) **Payment Account Information:**

**For Seller:**
Bank address:

The Hongkong and Shanghai Banking Corp.
Ltd Hong Kong
Swift Code: HSBCHKHHHKH
In Favor of: Transfield ER Futures Ltd.
USD A/C No: 808449854274

Corespondent Bank
HSBC Bank USA, New York
A/C No. 000044415
Swift Code: MRMDUS33

**For Buyer:**
Bank address:

EFG EUROBANK ERGASIAS
83, AKTI MIAOULI STREET
185 38 PIRAEUS – GREECE
SWIFT CODE: EFGBGRAA
TEL: 45 87 840, FAX: 45 87 856
INTO ACCOUNT NR:
0026.0029.20.1200301994
IBAN NR: GR37026600
290000201200301994
IN FAVOUR OF: BRAVE BULK TRANSPORT
LTD

18) **Third party rights**

(a) Unless provided to the contrary in this Confirmation, a person who is not a party to this Confirmation has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or enjoy the benefit of any term of this Confirmation.

6

(b) Any Indemnified Person and any Broker shall have the right to enjoy the benefit of and enforce the terms of clause 6(d) in the case of any Indemnified Person and clause 14 in the case of any Broker.

(c) Notwithstanding any term of this Confirmation, the consent of any person who is not a party to this Confirmation is not required to rescind or vary this Confirmation.

### 19) Partial Invalidity

If, at any time, any provision of this Confirmation or the Master Agreement is or becomes illegal, invalid or unenforceable in any respect under any laws of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality or enforceability of the provision under the laws of any other jurisdiction will in any way be affected or impaired.

### 20) Inclusion of historical Confirmations under Master Agreement

(a) **Unless the parties to this Confirmation specifically agree otherwise in writing, this clause 20 shall apply in accordance with its terms.**

(b) This clause 20 applies to this Confirmation and to every agreement entered into between the parties to this Confirmation (and no other persons) before the date of this Confirmation that is in respect of a forward freight swap, option or derivative:

   (i) that is expressly stated to be subject to, or is subject to substantially the same terms as, either the FFABA 2000 terms, the FFABA 2005 terms or the FFABA 2007 terms, with or without amendment; and

   (ii) in the case of a Confirmation that is stated to be subject to, or subject to substantially the same terms as, the FFABA 2007 terms that does not incorporate a clause substantially in the same form as this clause 20.

(c) Each agreement to which this clause 20 applies shall be treated as a Confirmation under the Master Agreement constituted pursuant to clause 9 as if such agreement had been entered into between the parties on the terms of the Master Agreement on the date of the first such Confirmation.

(d) If there is any inconsistency between the provisions of any agreement constituted pursuant to paragraph (c) above and the agreement constituting a Transaction to which this clause 20 applies, the provisions of the agreement constituting the Transaction to which this clause 20 applies will prevail for the purposes of the Transaction under such agreement.

(e) This clause 20 shall not affect any rights or obligations of the parties under any Transaction accrued before the date of this Confirmation.

7

(f) This clause 20 is effective notwithstanding any entire agreement clause or similar provision in any such agreement relevant to any such Transaction.

21) **Inclusion of subsequent Confirmations under Master Agreement**

(a) **Unless the parties to this Confirmation specifically agree otherwise in writing, this clause 21 shall apply in accordance with its terms.**

(b) This clause 21 applies to every Confirmation that is in respect of a forward freight swap, option or derivative entered into between the parties to this Confirmation (and no other persons) subsequent to an agreement incorporating a Master Agreement (as defined in and pursuant to a clause substantially in the same form as and equivalent to clause 9) having been entered into by them.

(c) Each such subsequent Confirmation shall constitute a Confirmation under the Master Agreement on the terms of clauses 20(c), (d), (e) and (f) as if they were incorporated and fully set out in this clause 21 with appropriate and necessary modifications for such incorporation.

**Signed for the Seller by**                          **Signed for the Buyer by**

...................................................          ...................................................
**Duly Authorized Signatory**                     **Duly Authorized Signatory**

Trade Ref: 8.909.0.LdVe.TC/Ifchor

## ATTORNEY VERIFICATION

State of New York )
                 ) ss.:
County of New York )

MICHAEL E. UNGER, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
                    Michael E. Unger

Sworn to before me this
13th day of July, 2009.

_____
        Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/10